# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 11, 2023

Lyle W. Cayce
Clerk

———————————

No. 22-20440

———————————

Calsep A/S; Calsep, Incorporated,

*Plaintiffs—Appellees*,

*versus*

Ashish Dabral,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-1118

_____

Before Clement, Elrod, and Willett, *Circuit Judges*.

Edith Brown Clement:

One company, alleging that another company stole the code for its software product, filed a lawsuit. During discovery, the alleged thief destroyed electronic evidence. That was a violation of several court orders and the Federal Rules of Civil Procedure. So, the district court sanctioned the spoliator by entering a default judgment and a damages award. Considering the record and the law, we AFFIRM.

No. 22-20440

## I.

Seven years ago, Ashish Dabral was hired to create a PVT ("pressure volume temperature") simulation software program. PVT programs are used by oil and gas companies to—through data-driven simulations of fluid behaviors—assess the efficiency of both existing and potential oil wells. Because creating such a product requires expertise in chemical engineering, fluid dynamics, *and* computer programming, there's only a handful of companies that sell it worldwide. So, it wasn't going to be easy for Dabral and his company, Insights Reservoir Consulting, LLC (IRC), to make a PVT product from scratch.[1]

Enter Pashupati Sah. Six years ago, Sah was "one of the highest ranking employees" at a Danish company called Calsep A/S. Calsep, a "leading provider[]" of PVT software globally, sells a product called "PVTsim." Apparently dissatisfied with his job after nearly a decade at Calsep, Sah decided to quit. Post-resignation, Sah was hired by Dabral, his old college friend, to develop a PVT software program in exchange for a stake in one of Dabral's companies, IPSS. Eight months later, a product called InPVT hit the market.

Surprised by a product that was "functionally identical" to PVTsim, Calsep started looking into InPVT. In Calsep's assessment, Dabral didn't have the technical skill or resources to develop a PVT product. But, as it soon discovered, Sah now worked for Dabral. After some digging, Calsep allegedly

---

[1] Note that there are a couple other companies tied to Dabral. For example, although Dabral creates and markets software products, he doesn't have the "coding expertise" to generate a "full-scale software program." So, he hires Bright Petroleum Software Solutions (BPSS)—an Indian software programming company—to "write[] the underlying [] code" for his products. Also, he has a second company, Intelligent Petroleum Software Solutions, LLC (IPSS), that "licens[es] software developed by IRC to the oil and gas industry."

found that Sah "copied hundreds of files containing Calsep's trade secrets to three external storage devices" (*i.e.*, USBs) before quitting. Per Calsep, those USBs contained a host of proprietary information, including the "source code repository" for PVTsim. Source code is the text that, written in a "programming language," "make[s] up a computer program." It "instructs a computer system how to operate" a particular program and, therefore, is the "most critical" part of any software product. Calsep contends that, with that "stolen" source code alone, Dabral and Sah created InPVT. So, in March of 2019, Calsep sued Sah, Dabral, and Dabral's various companies for misappropriation of trade secrets in violation of state and federal law.[2]

From the outset, discovery was contentious. But, in June of 2019, it escalated. That month, Calsep served a production request upon Dabral for (among other things) any "information related to the development" of InPVT. In particular, Calsep wanted a copy of Dabral's "complete source code control system." A source code control system is a "mechanism [that] track[s] changes and updates to the source code" of a given product. In other words, it records "the development of a software program."[3] Here, Dabral's source code control system would "contain[] the development history of all software" related to InPVT. With that, Calsep planned to analyze InPVT's source code to determine if data from PVTsim was used in its development. In response, Dabral argued that such a request was overbroad, irrelevant, and risked exposing his companies' own unrelated trade secrets. He emphasized

---

[2] Exit Sah. After unsuccessfully contesting personal jurisdiction, Sah stopped participating in this case.

[3] Such a system is made up of three key components: "'projects,' which . . . contain the source code itself and other files related to its development," "'collections,' which are databases of projects," and "'change sets,' which are unique files that document each revision to the source code and the nature of the change."

that his source code control system stores confidential data for innumerable products and software that have nothing to do with InPVT.

Calsep moved to compel the disclosure, arguing that Dabral was "stonewalling" its "narrow[]" but "fundamental" request. To resolve the matter, in October of 2019, the magistrate judge instructed the parties to negotiate both a protective order (*i.e.*, for Dabral's unrelated source code) and the proper "scope" of discovery productions. In February of 2020, the parties proffered an agreed-upon protective order, and the magistrate judge entered it. The order (1) identified any produced source code as "extremely sensitive" and limited its exposure, and (2) required the production of it in its "unmodified" form.

That wasn't the only spat, though. Meanwhile, in December of 2019, Calsep sought a copy of the materials that Dabral gave to its expert witness, Paul Price. Specifically, Price received a forensic report that apparently "contained significant information" about a review of Dabral's source code system "early in the litigation." Per Calsep, that report would speak to whether Sah uploaded any of Calsep's data onto the system or used it to develop InPVT. Also in December, Calsep filed a motion to compel IPSS to produce any items held by Sah, a part owner, including any "hard drives" (*e.g.*, the USBs). The magistrate judge granted both motions in February of 2020. She entered an order compelling Dabral "to produce a copy of everything given to their expert . . . for the formation of his opinion," including the report. And she later found that there was "a sufficient relationship between Sah and IPSS" to conclude IPSS had the hard drives, so the court ordered that they be turned over.

Relatedly, in March of 2020, the parties filed an agreed upon preliminary injunction that would control the parties' conduct during litigation. It enjoined Dabral from using the PVT software and prohibited the

"destr[uction] [of] any potentially relevant evidence, including electronically stored information." The lower court entered the order.

Cut to August of 2020. Calsep filed another motion to compel, alleging that Dabral still hadn't adequately disclosed his source code control system. Although Dabral had "produced [a] purported source code system" in April and July, Calsep claimed that these productions were "undoubtedly incomplete" and "had been manipulated." Both times the control system had "the same 'integrity' issues"—it was missing "folders" and didn't appear to be "complete" or "accurate." After a hearing on the motion, the magistrate judge ordered Dabral to "comply with the discovery requests" by September of 2020. Specifically, the court instructed Dabral's counsel that his client had one more "chance to come clean" and "comply voluntarily with his discovery obligations before [having to] respond to [a] motion for sanctions." So, in September, Dabral represented that he had "produced the entire" source code control system "with the exception of files deleted in the regular course of business long before this lawsuit."

But, according to Calsep, Dabral's representations were false. Calsep claimed that Dabral "deliberately made multiple deletions from [his] servers" during the litigation, including permanently deleting thirty-nine entries in the source code control system. Eleven of those deletions, according to Calsep, came after the magistrate judge's August order. Additionally, hundreds of thousands of records in Dabral's database had been deleted a few days before his prior productions. Believing the deletions to be intentional, Calsep filed a motion for sanctions.

At an evidentiary hearing, Dabral didn't contest that the deletions happened, but instead insisted that they didn't prejudice Calsep and weren't intentional. The court wasn't convinced and found that Dabral (1) filed false affidavits with the court, (2) purposefully delayed discovery, (3) manipulated

data, and (4) deleted electronic evidence from the source code control system. So, the magistrate judge recommended that the district court enter a default judgment against Dabral and award damages plus fees to Calsep. The district court adopted the report and recommendation in its entirety. Afterwards, Dabral filed a motion for reconsideration based on newly discovered forensic images that "vindicated" him. The magistrate judge recommended denying the motion and the district court agreed, denying the motion for reconsideration of the sanctions order. Dabral appeals.

## II.

We begin with sanctions. Generally, sanctions are reviewed for abuse of discretion. *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015); *Law Funder, L.L.C. v. Munoz*, 924 F.3d 753, 758 (5th Cir. 2019). Additionally, we review the "factual findings underpinning [a] sanction order for clear error." *Law Funder*, 924 F.3d at 758. The district court identified three vehicles for imposing the sanctions at issue in this case: Federal Rule of Civil Procedure 37(b), Federal Rule of Civil Procedure 37(e), and the court's inherent powers. We address each basis in turn.

First, parties must comply with court orders. Fed. R. Civ. P. 37(b)(2)(A). Failure to do so means a court may sanction a party, including by "dismissing the action" or "rendering a default judgment." *Id.* When a party "fails to comply with a discovery order," a court has "broad discretion in fashioning its sanction." *Law Funder*, 924 F.3d at 758. Second, parties have an obligation to preserve, through "reasonable steps," electronic evidence for trial. Fed. R. Civ. P. 37(e). Failure to do so is, again, sanctionable by

"dismiss[al]" or "default judgment." *Id.*[4] Before doing so, though, a court must first find that (1) the troublemaker "acted with the intent to deprive [the other] party of the information's use," (2) there was "prejudice to [the other] party from loss of the information," and (3) the sanction is "no greater than necessary to cure the prejudice." *Id.* Finally, federal courts may, for a number of reasons, invoke their "inherent power" to control and regulate the cases before them. *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1406–08 (5th Cir. 1993). That includes issuing "reasonable and appropriate" sanctions if a party is acting in "bad faith." *Timms v. LZM, L.L.C.*, 657 F. App'x 228, 230–31 (5th Cir. 2016) (per curiam) (citations and quotation marks omitted); *Vikas WSP, Ltd. v. Econ. Mud Prods. Co.*, 23 F.4th 442, 455 (5th Cir. 2022). Still, such a power is to be "interpreted narrowly" and used cautiously, *Newby v. Enron Corp.*, 302 F.3d 295, 302 (5th Cir. 2002) (citation omitted), especially when a statute or rule is at play, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power."). Accordingly, we limit our analysis to Rule 37, not the court's inherent powers. *See id.*

Our "caselaw imposes a heighted standard" for entering "litigation-ending sanctions" under the Federal Rules of Civil Procedure. *Law Funder*, 924 F.3d at 758.[5] Before a court ends a case through Rule 37 sanctions, it

---

[4] Relatedly, if a party "destr[oys]" or "meaningfully alter[s] evidence," otherwise known as "spoliation," a court may sanction them. *Guzman*, 804 F.3d at 713 (citation and quotation marks omitted).

[5] That's not to say, though, that they're never warranted. In fact, "courts have consistently demonstrated their willingness to impose the ultimate sanction of dismissal or default." *Moore v. CITGO Refin. & Chem. Co.*, 735 F.3d 309, 315 (5th Cir. 2013) (citation and quotation marks omitted). After all, such dismissals "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to

"must make four additional findings" beyond those required by the Rule itself: "(1) the discovery violation was committed willfully or in bad faith; (2) the client, rather than counsel, is responsible for the violation; (3) the violation 'substantially prejudiced the opposing party'; and (4) a lesser sanction would not 'substantially achieve the desired deterrent effect.'" *Id.* at 758–59 (alteration adopted) (quoting *F.D.I.C. v. Conner*, 20 F.3d 1376, 1380–81 (5th Cir. 1994)). This heightened standard steers our analysis.

Before us, Dabral argues that entering litigation-ending sanctions was an abuse of discretion because (1) there was insufficient evidence that relevant data was deleted, (2) he didn't act in bad faith when the deletions occurred, (3) the deletions didn't prejudice Calsep, and (4) lesser sanctions were more appropriate. Calsep, in response, insists that Dabral's deletions—which amount to spoliation—were "deliberate[]," in "defiance of his discovery obligations," and resulted in "immense prejudice," meaning a default judgment was justified. We take Dabral's arguments in turn.[6]

## A.

First, we consider whether a possible discovery violation occurred in the first place. The district court concluded that Dabral deleted or manipulated source-code data, in violation of the court's orders and the Federal Rules of Civil Procedure. On appeal, Dabral contends that the lower court "improperly relieved" Calsep of its burden to prove up spoliation. But the burden *was* placed on Calsep. And the court relied on the evidence provided by Calsep's expert, along with other evidence Calsep submitted, in

––––––––––––––––––––

warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Id.* at 315–16 (citation and quotation marks omitted).

[6] Note that prong two of the heightened standard framework, the client's fault, isn't contested here.

reaching its conclusion that evidence had been "intentionally deleted." For example, the names of deleted files, the dates of deletion, and the nature of the missing files were all considered. Dabral fails to respond to the finding of spoliation, only arguing on appeal that the deletions were irrelevant or made prior to trial.

As for noncompliance with several court orders, Dabral offers no real contest on this point. Instead, he argues that *he* didn't withhold discovery or destroy evidence—his *company* did. But, he fails to advance any support for that argument, *see* FED. R. APP. P. 28, meaning he doesn't rebut the charge of violating Rule 37(b). In reviewing the record, it's plain that Dabral ignored or violated several court orders, including: (1) a protective order requiring disclosure of the "unmanipulated" source code, (2) an order compelling Dabral to disclose a report given to his expert witness, (3) an order requiring production of Sah's USBs, (4) a preliminary injunction forbidding destruction of evidence, and (5) an order compelling Dabral to provide copies of the source code control system. Those findings are clearly supported by the record.[7]

Consequently, we conclude that the district court didn't err in finding that Dabral destroyed evidence and disobeyed court orders, thereby committing sanctionable offenses.

---

[7] To drive the point home, consider four of the district court's more detailed findings. First, a few days after the agreed upon preliminary injunction was entered in March, Dabral deleted three change sets "in violation of the agreed order." Second, prior to the April 2020 production (the first source code production), four databases "necessary to restore" the data for an expert's review were deleted. Third, a few days before the July 2020 production (the second source code production), 185,000 items in the produced data were deleted. Fourth, just before the September 2020 production (the third and compelled production), "separate and different destructions occurred on [two different] servers, permanently deleting files" in the control system in a manner that made it "impossible to see the volume or content of what was deleted."

No. 22-20440

## B.

Next, we turn to bad faith.[8] Below, the district court concluded that Dabral "delayed discovery, manipulated electronic data, and permanently deleted a significant amount of electronic data." In reaching that decision, the court recounted Dabral's misconduct, including (1) slow walking the production of the source code control system and expert materials, (2) deleting electronic evidence during discovery, including mere days after court orders and discovery requests, (3) hiding important information, like the existence of two control system servers, and (4) refusing to comply with several court orders. The district court also noted that Dabral filed an affidavit claiming Sah didn't provide any of Calsep's data to Dabral's companies in creating InPVT, but the record showed otherwise. Considering all of that, the court concluded that Dabral's "actions reveal a pattern of behavior that raise the inference of bad faith and [an] intent to deprive" Calsep of the discovery necessary to make its case.

_____

[8] We note that there are overlapping standards at play—Rule 37 and the heightened standard for default sanctions both require some finding of bad faith. For example, for litigation-ending sanctions, "dismissal with prejudice [] is appropriate only if the refusal to comply results from willfulness or bad faith and is accompanied by a clear record of delay or contumacious conduct." *Conner*, 20 F.3d at 1380 (quoting *Coane v. Ferrara Pan Candy Co.*, 898 F.2d 1030, 1032 (5th Cir. 1990)). That means that, under the heightened standard, "when a defendant demonstrates flagrant bad faith and callous disregard of its responsibilities, the district court's choice of the extreme sanction is not an abuse of discretion." *Emerick v. Fenick Indus., Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976); *Tech. Chem. Co. v. IG-LO Prods. Corp.*, 812 F.2d 222, 224 (5th Cir. 1987). Rule 37(e), too, requires "willfulness or bad faith," which may be satisfied when a party "fail[s] to comply with [a] court's discovery order even after he was personally instructed to do so," or "by a repeated failure to provide anything other than generalized or non-responsive answers in response to specific requests for compliance by the court." *See Bell v. Texaco, Inc.*, 493 F. App'x 587, 593 (5th Cir. 2012) (per curiam) (citations and quotation marks omitted). But here we have no need to consider whether, and how, these various frameworks may differ. Given the record before us, Dabral clearly acted willfully and in bad faith under any standard.

10

In response, Dabral advances two defenses. First, he argues that there's no evidence *he* destroyed any software, or that *he* was dilatory during discovery. Instead, Dabral emphasizes, his brother and BPSS handled the source code control system and discovery productions, meaning *they* must've committed the bad acts. But, that argument is unavailing.

BPSS and Dabral's brother Sudhanshu work under the direction of IRC, which "retains all rights to the software" made by the company. And, as Dabral swore, he is the "100% owner" of IRC. Consequently, we cannot— for the limited purposes of this case—separate Dabral's existence as a party from his companies' actions in this litigation (*i.e.*, his co-parties). Besides, Dabral doesn't cite to any binding caselaw to support his proposition. In fact, he barely advances any cases or substantive arguments despite having an obligation to do so. *See* Fed. R. App. P. 28(a). Therefore, we aren't convinced by his first argument.

Turning to Dabral's contention that there's no "clear record" of "delay" or bad conduct in this case, he maintains that (1) any deletions to the source code were done in the ordinary course of business and outside of any court order, and (2) he ultimately complied with any discovery requests or court orders, even if he did so untimely. Again, Dabral's arguments fail. It may be true that *some* of Dabral's deletions were irrelevant or non-prejudicial. But, the district court—relying on expert testimony—found that *many* of those deletions were intentionally performed and that the deleted information was "necessary" for Calsep's case. After reviewing the record, we cannot say that finding was an abuse of discretion or based on clearly erroneous facts. At the end of the day, parties have an obligation to preserve evidence during trial, even things that may be destroyed in the ordinary course of business. Fed. R. Civ. P. 37(e).

As for non-compliance, Dabral seems to miss the point. First, he doesn't actually contest that he missed several deadlines throughout the case. Instead, he insists that those violations were ultimately remedied. But, discovery delays are serious, especially when they are part of a pattern. *See United States v. $49,000 Currency*, 330 F.3d 371, 377 (5th Cir. 2003) ("Claimant-Appellants [argue that they] partially complied with previous discovery requests, and were only a 'little tardy' with their final discovery disclosures. The record, however, contradicts this claim, and instead indicates that rather than being merely a little tardy, Claimants-Appellants failed in several—if not all—material respects to comply with the court's [discovery] order.").

And, going beyond his delays, Dabral's misconduct also involves ignoring or violating court orders. He flouted (1) the protective order requiring disclosure of the "unmanipulated" source code, (2) the order compelling him to disclose the materials provided to his expert, (3) the preliminary injunction forbidding destruction of evidence, and (4) the order compelling him to provide copies of the source code control system to Calsep. Knowingly ignoring an obligation, especially multiple times, may alone be enough to find bad faith. *See Tech. Chem. Co. v. IG-LO Prods. Corp.*, 812 F.2d 222, 224–25 (5th Cir. 1987) (finding no abuse of discretion in default-judgment sanction for "repeated failures" that "culminate in a party's failure to comply with a court [discovery] order"). And, noncompliance is doubly problematic when the lower court issues—like it did here—a warning. *See Bell v. Texaco, Inc.*, 493 F. App'x 587, 593 (5th Cir. 2012) (holding that "Plaintiffs' repeated failure to comply with discovery orders, even after being warned of the possibility of sanctions and personally instructed on how to comply, constituted willful noncompliance" justifying litigation-ending sanctions). Much like delays, a pattern of misconduct

doesn't help. *See id.* ("Plaintiffs regularly ignored court orders, even those ordering [basic disclosures].").

Here, Dabral admittedly deleted evidence, delayed discovery on several occasions, and ignored court orders. And, when he was offered one last "chance" to "come clean" and submit an unmodified source code control system, he didn't. Instead, he deleted more evidence and produced a copy of the system that had numerous other files missing. Per his own expert, those deletions were seemingly "intentional" and done after the filing of Calsep's suit and even after the district court's disclosure order. So, the district court concluded that Dabral acted willfully and in bad faith. The court didn't reach that conclusion easily. Instead, it came after months of violations and a long evidentiary hearing. Only then did it make its informed decision. We don't take this lightly either. But, given the record, we cannot conclude that the district court erred in finding that Dabral acted in bad faith by blatantly ignoring court orders—despite a warning and a last chance to comply from the court—and deleting important evidence.

## C.

Next, we consider prejudice. Generally, we find prejudice when a party's case-in-chief is seriously and gravely impacted. *See Bell*, 493 F. App'x at 593 ("[W]e consider whether the other party's preparation for trial was substantially prejudiced." (citation and quotation marks omitted)). Below, Calsep argued that Dabral's deletions and discovery violations harmed its ability to litigate its claims. Calsep's expert testified that the deleted files were critical to the case because, without them, he couldn't properly compare PVTsim and InPVT, meaning Calsep couldn't directly prove its misappropriation claim. Dabral's own expert admits that several deletions occurred and were permanent. In response, Dabral maintains that the deleted

data wasn't relevant to the case and the scale of deletions was overexaggerated.

The district court disagreed. Relying on Calsep's expert, the court concluded that, without the missing files, Calsep couldn't perform the analyses that were necessary to prove up its misappropriation claims. Per the court, Calsep's "expert, who has performed similar analysis in over 100 cases, testified that he had no confidence in the data, or that he could get a reliable result." Therefore, said the lower court, Calsep was unquestionably prejudiced by Dabral's conduct, which "prevented [Calsep] from obtaining evidence necessary to establish [its] claim" against Dabral.[9] We agree.

On the record before us, we cannot say that the district court's finding—namely, that the missing items were relevant and that their deletions was prejudicial—was an abuse of discretion or based on a clearly erroneous assessment of the facts. Calsep proffered plenty of proof that the deletions were important, including expert testimony and circumstantial evidence. Besides, the mere inconvenience of dealing with Dabral's unusable

---

[9] At a hearing, the magistrate judge asked whether Calsep's expert could "do [his] planned analysis and render an expert opinion with what [he had] been provided." His response:

> Well, the short answer is no. . . . We need to look at the entire history, the communication, the development and that audit trail of everything that happened. What was influencing the project, how was the project managed, how was the code changing, what are the documents and design documents. . . . We have tried for a long time to get the material. We've been stymied. These are unprecedented levels of manipulation. . . . So as we stand today we have, really I'll call it garbage. In the computer industry we have a saying, "garbage in, garbage out." And so, if I were to try to— you know, the net of all that is I have no confidence that I can—it would just not be professionally sound to try to move forward. Based on the information that we have, I have no confidence that we have legitimate data and that it would result in valid results.

productions and being forced to repeatedly file motions to compel may alone amount to prejudice. *See Bell*, 493 F. App'x at 594 ("[T]he district court did not abuse its discretion in finding that Plaintiffs' noncompliance [with discovery orders] in this case caused significant delay and required the filing of multiple motions to compel. As such, it was not an abuse of discretion to conclude that [the Defendant] was substantially prejudiced by Plaintiffs' noncompliance."). Consequently, we find the district court didn't err by finding Calsep was prejudiced.

## D.

Now, we ask whether the district court appropriately considered lesser sanctions. As a general matter, litigation-ending sanctions are reserved for the most heinous of scenarios. *See Emerick v. Fenick Indus., Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976). Therefore, a court must consider whether some lesser sanction would've "substantially achieve[d] the desired deterrent effect" without ending the case. *Conner*, 20 F.3d at 1381.

Here, the district court found Dabral's conduct to be so "egregious"—given it involved "willful[] and intentional[] attempt[s] to manipulate the judicial system" through dilatory tactics and disobedience—that future actors wouldn't have been sufficiently deterred with a "less drastic sanction." The court emphasized that, although Dabral was "given . . . multiple opportunities to comply" with the court's orders—including an instruction that he had one "last chance" to submit his source code control system—Dabral still didn't comply. All in all, the district court concluded, because Dabral destroyed evidence crucial for Calsep to prove its case and disregarded *four* separate court orders, lesser sanctions were insufficient. On appeal, Dabral contends that the "district court failed to consider any lesser sanctions" and, relatedly, an adverse inference instruction would've worked fine. But, we disagree for two reasons.

First, Dabral is mistaken—the district court *did* consider lesser sanctions. Admittedly, that consideration wasn't greatly detailed, but by concluding that a "less drastic sanction" wasn't appropriate, the lower court did nod to the possible imposition of other sanctions.

Second, and more importantly, given the facts of this case, the court was not required to consider *specific* alternative sanctions. For instance, in *In re Taxotere (Docetaxel) Products Liability Litigation*, we found that "lesser sanctions would not have served the best interests of justice" when a party failed to comply with a "required [discovery] deadline." 966 F. 3d 351, 360 (5th Cir. 2020) (alteration adopted) (citation and quotation marks omitted). Although the party "provided other forms of discovery," it "consistently failed to comply with the court's [discovery] order" and, as such, it was "unclear what lesser sanctions could have been appropriate following the district court's warnings and second chances." *Id.* (citations and quotation marks omitted). While the district court could have given closer consideration to monetary sanctions or an adverse inference here, *see Bell*, 493 F. App'x at 592–93, doing so is not always required. Courts have not required deep consideration of alternatives when it's plain that a lesser sanction wouldn't have done the trick. *See $49,000 Currency*, 330 F.3d at 379 ("[W]ere we now to adopt Claimants–Appellants' view, we would have to surmise that at this point in the discovery fiasco, the district court was yet required to attempt to coax Claimants–Appellants into compliance with its order by imposing incrementally increasing sanctions. We do not adopt such a view."); *Law Funder*, 924 F.3d at 760 ("The district court explicitly found prejudice to [the movant] in its sanctions order, and it found in its order denying [the wrongdoer's] postjudgment motions that [the wrongdoer] acted willfully and that lesser sanctions would not have sufficed."). That's especially true where, as here, the court warned Dabral to comply with its orders or face penalties. Warnings have weight—they may even allow a court

to jump straight to litigation-ending sanctions. *Vikas*, 23 F.4th at 455–56 ("[T]he failure of express warnings could allow the court to find that a lesser sanction would not substantially achieve the desired deterrent effect." (citation and quotation marks omitted)); *Bell*, 493 F. App'x at 593 ("At that time, the court again warned Plaintiffs that their case would be dismissed as a punitive sanction if they continued to ignore court orders. This warning had no apparent effect on Plaintiffs' behavior in the litigation. We conclude that the district court did not abuse its discretion in determining that Plaintiffs' previous failure to adhere despite the imposition of less drastic sanctions indicated that additional monetary sanctions would not have ensured compliance.").

Here, Dabral *admittedly* violated several court orders. He doesn't contest that. Instead, he contends that the violations weren't that serious and that a lesser punishment would've been more fitting. But, in making that argument, Dabral misunderstands the extreme nature of his misconduct—intentionally deleting evidence key to Calsep's misappropriation claim in the face of multiple court orders. *See Balancecxi, Inc. v. Int'l Consulting & Rsch. Grp., LLC*, No. 1:19-cv-0767-RP, 2020 WL 6886258, at *14 (W.D. Tex. Nov. 24, 2020) ("It is hard to imagine a more pernicious pattern of evidence destruction. The Defendants deleted evidence multiple times, did so intentionally, and did so despite knowing they had a duty to preserve the evidence. Further, the evidence they destroyed was not peripheral to the case—it went to the very heart of [the plaintiff]'s trade secret claims, and likely would have proven or disproven those claims. All of this supports [litigation-ending] sanctions."). Given that level of conduct, the district court was not required to consider lesser sanctions in any more detail than it did.

That's doubly true when you consider the district court's leniency prior to the default judgment. In *Taxotere*, we noted that giving a "'second or

third chance' is *itself* 'a lenient sanction, which, when met with further default, may justify imposition of the ultimate sanction of dismissal with prejudice.'" 966 F. 3d at 360 (emphasis in original) (quoting *Callip v. Harris Cnty. Child Welfare Dep't*, 757 F.2d 1513, 1521 (5th Cir. 1985) (per curiam)). That's not to say that no details are required. *See Vikas*, 23 F.4th at 450–51 ("Such severe sanctions cannot survive review without careful findings of fact, and 'careful' cannot describe the district court's one-page, 160-word order ending [this] case. The court stressed irrelevant or unsupported findings, never explained the sanction's legal basis, and never seriously considered lesser sanctions."). Admittedly, a court may need to "try lesser sanctions," or, at the very least, "explain . . . why lesser sanctions would fail." *Id.* at 456. But as discussed above, the district court did consider lesser sanctions and even issued a warning, a statement that may itself have been a lesser sanction. *Taxotere*, 966 F. 3d at 360 (a "second or third chance is itself a lenient sanction" (citation and quotation marks omitted)).

In sum, a detailed consideration of lesser sanctions isn't required where, as here, a court appropriately concludes that that a party's act was particularly egregious, part of a pattern of repeated violations, and—as evidenced by the wrongdoer's conduct—there's some indication that lesser sanctions would be futile or ignored. Here, prior to its ruling, the district court warned Dabral that this was his last chance to "come clean," and instructed him to comply with the court's discovery orders. In the sanctions ruling itself, issued after a hearing, the court emphasized that—given Dabral's flagrant violations and the destruction of evidence—this was an "egregious case," and any lesser of a sanction "would not achieve the desired deterrent effect." We agree and see no error in the court's analysis. *See Taxotere*, 966 F.3d at 360 ("Given this record, it is unclear what lesser sanctions could have been appropriate following the district court's warnings and second chances." (citation and quotation marks omitted)). A default

judgment is sometimes the only practicable solution. *See KCI USA, Inc. v. Healthcare Essentials, Inc.*, 801 F. App'x 928, 935 (6th Cir. 2020) ("It is in cases like this one, where the obstruction prevented the other party from accessing evidence needed to bring the case, that default is most likely to be the appropriate sanction." (alteration adopted) (citation and quotation marks omitted)). Additionally, it doesn't appear that anything lesser would've "serve[d] the bests interests of justice." *In re Deepwater Horizon*, 907 F.3d 232, 236 (5th Cir. 2018).

\* \* \*

Given the record and the law, we cannot say that the district court erred in its sanctions analysis. *Moore*, 735 F.3d at 309 ("The question is not whether the Court of Appeals would as an original matter have dismissed the action; it is whether the District Court abused its discretion in so doing." (alterations adopted) (citations and quotation marks omitted)). Therefore, we AFFIRM the lower court's sanctions.

### III.

Finally, we briefly address Dabral's motion for reconsideration. Under Federal Rule of Civil Procedure 60(b), a party may request relief from a "final judgment" for various reasons, including "newly discovered evidence that, with reasonable diligence, could not have been discovered" sooner. To succeed on such a motion, "a movant must demonstrate: (1) that [he] exercised due diligence in obtaining the information; and (2) that the evidence is material and controlling and clearly would have produced a different result if present before the original judgment." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 639 (5th Cir. 2005) (citation and quotation marks omitted).

Where, as here, the party moving for reconsideration failed to object below to the magistrate judge's report and recommendation, our review of

the denial of that motion "is limited to plain error." *Johnson-Williams v. Mortg. Elec. Registration Sys., Inc.*, 675 F. App'x 396, 400 (5th Cir. 2017). To prove plain error, a party "must show (1) error (2) that is plain and (3) that affects substantial rights." *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 675 (5th Cir. 2015) (citing *United States v. Escalante–Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (en banc)). Still, a court may "remedy the error" only if it also "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

Seven months after the district court adopted the sanctions order, Dabral filed a motion to reconsider. In that motion, Dabral contended that "[d]ue to forensic images that were recently discovered in a BPSS storage unit in India," the "critical files" that had been deleted were "now available for Calsep's review." Dabral—insisting that there was "no reason" why he would have "intentionally withh[e]ld the images" during the lawsuit, and that he and his brother "completely forgot about them"—maintained that the forensic images "represent exact copies of the source code and [its] history" that Calsep sought in discovery. As such, Dabral, asked the district court to withdraw the sanctions, and "allow the parties to engage in resolution discussions . . . or litigate the case on its merits." But, the district court denied Dabral's motion. The court found that, "because the evidence is not new," it could have been discovered with due diligence before. Additionally, it determined that Dabral failed to show "that the evidence is controlling and material such that the outcome would have been different." We agree.

On appeal, Dabral insists that the court incorrectly imputed knowledge of the images to him. That's wrong. The simple truth is that the images in question existed *during* the course of the litigation. That's plain from the record—reports from November of 2019 discussed the images. Dabral doesn't deny that. Instead, he argues that he "could not . . . have

noticed [a] scant reference" to the images in a report, and maintains that such information was "buried" in the record. Yet, Dabral cannot offer any reason—other than mere forgetfulness—why he couldn't acquire the images sooner. That's fatal for Dabral. *See Johnson-Williams*, 675 F. App'x at 401 ("[The party] has not explained why she could not have obtained the chain of title analysis before judgment was rendered. All of the documents relied upon in the analysis predate the lawsuit, and the affidavit from the author of the analysis does not indicate that he was unavailable to conduct the analysis before judgment was rendered. The mere fact that [the party] did not obtain the analysis until after judgment was rendered does not establish that it could not have been obtained before then with the exercise of diligence."). And, Dabral hasn't shown that he acted with diligence during the case to locate these images. *See Thermacor Process, L.P. v. BASF Corp.*, 567 F.3d 736, 744 (5th Cir. 2009) (although movant did not receive evidence until after judgment, the party didn't show "that it acted with due diligence to obtain the [evidence] . . . nor has any evidence been provided that [the evidence] could not have been obtained prior to responding to [a] summary judgment motion"). At the end of the day, these images aren't new. *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 598 (5th Cir. 1980) ("Given [the party]'s testimony that he 'just couldn't find' the cancelled checks at the time of trial because he 'just had misplaced them at home' and other statements to that effect, we agree with the lower court that the evidence was not 'newly discovered' but merely 'newly produced.'").

Dabral also contends the images would have changed the outcome of the case. But, we don't find that they "clearly would have produced a different result" in the judgment. *Hesling*, 396 F.3d at 639. Although Dabral argues that the images change the game, Calsep's expert insists that too much data is still missing from the source code control system, rendering a proper review impossible. The district court credited that testimony in its

order, and there's no reason to question that now. Not to mention, the district court rested the sanctions order on *far more* than the portion of destroyed evidence seen in these forensic images. *Cf. id.* at 641 ("Because the withheld documents would not have changed the preemption determination, they clearly would not have affected the ultimate case determination.").

In the end, Dabral admittedly knew of the images and, before us, fails to show why he could not have acquired them with reasonable diligence. *Gov't Fin. Servs. One L.P. v. Peyton Place, Inc.*, 62 F.3d 767, 772 (5th Cir. 1995). Because there's no question that the lower court's decision does not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings," there was no plain error. *Lawrence*, 808 F.3d at 675.

\* \* \*

Considering the standard of review and the record before us, we AFFIRM the district court's decision on Dabral's motion for reconsideration.